1         IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2            Richmond Division

3

4

5

6  THE UNITED STATES OF AMERICA,

7                           Plaintiff,

8      versus                   3:17CR45

9  BENJAMIN FAULKNER,

10                          Defendant

11

12

13

14      Before:  HONORABLE JOHN A. GIBNEY, JR.
         United's States District Judge
15

16

17

18

19          September 15, 2017

20         Richmond, Virginia

21

22

23         GILBERT F. HALASZ
       Official Court Reporter
24        U. S. Courthouse
      701 East Broad Street
25      Richmond, VA 23219

1

2

3                         APPEARANCES

4

5               Jessica D. Aber, Esq.
        Assistant United States Attorney
6               Elham Peirson, Esq.

7

8

9               Cary B. Bowen, Esq.
                 For the defendant
10                 The Defendant
            In his own proper person
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Case number 3:17 CR 45.

2          The United States of America versus Benjamin

3     Faulkner.

4          Jessica Aber and Elham Peirson represent the United

5     States.

6          Cary Bowen represents the defendant.

7          Are counsel ready to proceed?

8          MS ABER:  United States is ready.

9          MR. BOWEN:  We are, sir.

10         THE COURT:  All right.

11         Good morning to Ms Peirson again, Mrs. Aber again,

12    and Mr. Bowen, and Mr. Faulkner.  Good morning, sir.

13         All right.  We are here today for Mr. Faulkner's

14    sentencing.  Have you had a chance to go over the

15    presentence report with Mr. Faulkner?

16         MR. BOWEN:  I have, sir.

17         THE COURT:  All right.

18         Do you have any objections to it?

19         MR. BOWEN:  We have resolved them, sir.

20         THE COURT:  Good.  Thank you.

21         All right.  Do you have any objections to it,

22    Ms Aber?

23         MS ABER:  No, Your Honor.

24         THE COURT:  All right.  Here is how it guidelines

25    work out in this case.

1     The base offense level is 42, which consists of 32

2     points for the base offense, plus four because there is a

3     minor under 12, plus two because there was sexual contact

4     involved, plus two because there was distribution of the

5     images, plus two because there was a computer involved.

6     He gets give points adjustment or enhancement for sexual

7     conduct in this case, which makes him 47.  The government

8     has moved for the third point off for acceptance, so he

9     gets three points off for acceptance of responsibility,

10    which would ordinarily lead to a level 44.  But 43 is the

11    maximum, so it is.

12    He has no criminal history points.  So he is category

13    one.

14    The guideline sentence range is life.  And that, of

15    course, is advisory only.

16    I have received a number of letters in this case.  I

17    have received letters from his parents, his two sisters,

18    from his grandparents, from his maternal grandmother, from

19    his uncle, from his second cousin, from his pastor and

20    from a family friend, whose name is -- I don't know what

21    his name is.  I misplaced that letter.  I apologize that I

22    don't know.  Oh.  Les Downes is who that is.  Okay.

23    All right.  Essentially what those letters say is

24    that Mr. Faulkner was a good and helpful person to others;

25    that he grew up in a normal life with a normal family.

1    That his family is important to him, and he has always

2    demonstrated that.  That he -- the people are surprised

3    that there is another side to him.  And, candidly, they

4    didn't see that as he was growing up because he had a life

5    that was pretty normal, and that he gave all the

6    indications of being, as somebody said, "the boy next

7    door."

8         I also have received statements from the grandmother

9    and mother of the victim in which they discuss the

10   devastating effect of this offense on the victim, the

11   child, and essentially the horror inherent in the offense

12   in this case.

13        I thank them for that.  And I thank all the family

14   members as well.

15        Mr. and Mrs. Faulkner, Sr., you are here today, and I

16   thank you both for coming.  I know it means a lot to your

17   son to have you here on a difficult day for him.

18        All right.  Do you have any witnesses?

19        MS ABER:  Yes, Your Honor.

20        THE COURT:  What do you have?

21        MS ABER:  The government calls Megan Blohm to the

22   stand.

23        THE COURT:  How do you spell the last name?

24        MS ABER:  B-L-O-H-M.

25        THE COURT:  Okay.  Blohm.  Thank you.

```
 1        Thank you for coming today, ma'am.

 2                        MEGAN BLOHM

 3             WAS SWORN AND TESTIFIED AS FOLLOWS:

 4                      DIRECT EXAMINATION

 5        THE COURT:  All right.

 6        Thank you for coming today.

 7   BY MS ABER:

 8   Q    Your Honor, Ms Blohm is a victim in this matter and

 9   she would like to read the statement she provided to The

10   Court.  Thank you.

11        THE COURT:  Before you do that, tell me where you

12   came from.

13        THE WITNESS:  Austin Texas.

14        THE COURT:  From where?

15        THE WITNESS:  Austin, Texas.

16        THE COURT:  Well, thank you for coming all that

17   distance.  I appreciate it.  All right, Ms Blohm, tell me

18   whatever it is you want to tell me.

19        THE WITNESS:  Okay, Your Honor.

20        THE COURT:  Do you have a written statement, ma'am?

21        THE WITNESS:  I do.  I wrote a letter.

22        THE COURT:  Would you like to give that to me?

23        THE WITNESS:  I would prefer to read it if possible.

24        THE COURT:  Okay.

25        THE WITNESS:  Your Honor, October 7th, 2016 will
```

Blohm - direct

1    forever be the worst day of my life.

2         We had been contacted by agents from Homeland

3    Security who informed us that my cousin, somebody I

4    considered extremely close, had recently been arrested and

5    charged for something, but he had, in addition, confessed

6    to violating and photographing both our two-year old

7    daughter and our eight-month old son.

8         I was shocked, horrified, disgusted.  My thoughts

9    raced.  They were only babies.  They are completely

10   defenseless.  They didn't speak.  They were without words.

11        I treated my cousin as a brother.  He knew I had

12   trust issues.  He worked with children.  He told me he

13   wanted to become a foster parent.

14        I was shocked.  I didn't know how many victims there

15   could possibly be here, like what was the shear magnitude,

16   how could this happen?  Any bit of trust I had in people

17   around me is instantly dissipated.  My family was

18   shattered.  My trust in my own mother instincts gone.  The

19   gents were talking, but I heard nothing.

20        Images pulled from a folder.  They had photos of our

21   babies in our own living room, in our little one's

22   bathroom.  And any chance for disbelief was immediately

23   stripped away.  It was real and absolutely terrifying.  My

24   life would never be the same.

25        This, unfortunately, was only the beginning of the

Blohm - direct                                    8

1    nightmare, because we were told we had to go home and pick

2    up the babies.

3            Extreme nausea, anxiety, set in as we packed them up.

4    We pulled up to CPS headquarters.  I heard from an insight

5    class big trauma versus little.  This is my fist exposure

6    to a big trauma.

7            Cortisone, maximum levels, fight versus flight.

8    These feelings obviously stay with me to this day.  The

9    situation was just starting to permeate as the advocates

10   started handing me brochures about children and sexual

11   abuse.  Still didn't hear much of what she was saying.

12   This was real.  I wish I didn't believe this was real.

13           All of these strangers in the room knew more than I

14   did.  How could this happen?

15           They had the forensic interview set up for a two-year

16   old daughter.  Nearly two years old.  She could barely put

17   two words together.  My daughter was still a baby in

18   diapers and had never gone anywhere without me.

19           THE COURT:  This is the two-year old?

20           THE WITNESS:  The two-year old.

21           I now trusted no one, and there were strangers about

22   to take my littlest toddler away to a different room to be

23   interviewed about incidents I still barely knew anything

24   about.

25           I mustered strength from the depths of my core.  What

1   would she say?  She was so tiny.  Was she hurt?  How could

2   I not know?  What had happened in near moments while my

3   back was turned in my own home?

4        The agents took her back by the hand with a pacifier

5   and her blanky.  I, the self-proclaimed helicopter mom,

6   had failed to protect by own babies under my own roof, and

7   now I am lying to her and reassuring that everything is

8   okay when in fact I was petrified.  I still at this point

9   didn't know exactly what had happened to her.

10       The anguish I felt as a mother was only exacerbated

11  in the following day as my babies next endured medical

12  examinations.

13       He tried to receive oral sex from one of the kids,

14  the doctors say.  We have to send you elsewhere after this

15  for lab.  This kept getting worse.  We had to object to

16  having more photographs of their genitals taken under

17  bright lights.  My toddler was beyond scared and confused.

18  I comforted them each as they were poked and prodded for

19  blood and urine samples, again, by strangers.  Bags taped

20  to their genitals.  I had no clue how to explain this to a

21  two-year old, how to explain why any of that was happening

22  to her.

23       I received disapproval at the lab and was forced to

24  explain to a nurse why my eight-month old baby and my

25  two-year old were being tested for so many STDs.  No

1   parent should have to endure this.

2       As time progressed my feelings shifted from shock to

3   anger.  Rage.  This is my cousin.  We gave him employment

4   and a place to live before we ever had children.  He and I

5   sat together at the hospital for days as my grandfather

6   was dying.  I helped him buy clothes.  I helped him with

7   social awkwardness.  I gave him life advice.  I confided

8   in him about the pain of losing my parents.  He told me he

9   wanted to become a foster parent.  This is the absolute

10  last person I would ever, ever, expect to hurt by babies,

11  to hurt our entire family irreparably this way.

12      My reality at every level came crashing down as I

13  realized the purpose of his visit to us had to be groom us

14  for future visits.

15      Within weeks I dropped weight, almost twenty pounds,

16  and struggled with digestive issues and sleeplessness from

17  all the stress and nightmares.  This is a big dirty secret

18  I felt I have had to keep from friends, neighbors, our

19  entire community for fear of judgment.

20      I will be forever processing the full magnitude and

21  scale of how this really affected me and the people I care

22  about.  This is actually the first public acknowledgment

23  of any of this.  And now our family is tarnished with this

24  filth.

25      Relationships strained.  I can't see my family

Blohm - direct                                          11

1   without being reminded of him and this nightmare.  I am

2   disturbed that so much virtuosity was wasted on this

3   horrific calculated agenda.

4        I am saddened that my encouragement, love and praise

5   for my cousin did not sway him from exploiting the

6   implicit trust he was given in our home.  Disappointed

7   that as an adult he consciously chose to exploit, abuse,

8   deceive, and prey upon helpless babies, children and their

9   trusting parents as opposed to asking for or getting help.

10       I can confidently say that because of what Benjamin

11  Faulkner has done my entire world has been tainted.  I am

12  forever changed, despite over 50 hours with a therapist

13  the last year.  I still don't trust my family members,

14  friends, caregivers, my kids' teachers.  I am always

15  terrified to show my children on social media for fear it

16  will be photo shopped and shared by other pedophiles.  I

17  have repeated nightmares this will happen again.  And my

18  home is scene of a crime.

19       These sweet moments with my toddlers are forever

20  haunted by what happened there.  I have to live knowing

21  there is images of my babies floating around on the

22  internet forever.  And I couldn't do anything to prevent

23  it.

24       When he abused our babies he stole a piece of my

25  soul.  Please, please, think of me and my babies as you

1   sentence this person to prison.  Keep in mind that this

2   individual made a calculated effort to prey on family

3   members.  Not just any family members, but somebody he had

4   a bond with.  Somebody who helped him and looked out for

5   him.  The distance that he traveled to do this speaks

6   volumes about his inability to control himself.  We will

7   never be able to take back what he chose to do to us, our

8   family, and many other victims.  My heart truly goes out

9   to them.  We are with them, and we are fighting every day

10  with them.

11       And finally, I want to thank everyone for your time

12  and attention.  Most importantly, I really want to thank

13  you from the bottom of my heart, the agents and

14  investigators, the heros who helped keep my babies safe

15  from further prolonged, possibly much worse, harm.  I find

16  refuge after this tragedy in the fact there are good guys

17  like all of you out there working tirelessly to heap us

18  safer.  Thank you.  God bless.

19       THE COURT:  Let me ask a couple questions.

20       THE WITNESS:  Sure.

21       THE COURT:  Did you say that your child was at child

22  protective services?

23       THE WITNESS:  Once the Homeland Security agents

24  contacted us we took them over to the CPS headquarters for

25  forensic interview.

Blohm - direct                    13

 1        THE COURT:  Okay.  All right.

 2        And Mr. Faulkner is your cousin?

 3        THE WITNESS:  My cousin, yes.  His mother is my

 4   father's sister.

 5        THE COURT:  Okay.

 6        And, you know you used the word "tarnished" to refer

 7   to yourself and your family.  The only way in the world

 8   you can be tarnished is to tarnish yourself.  And you

 9   haven't done that.  And your babies haven't done that.

10   You are not tarnished.  They are not tarnished.  And I

11   hope you will remember that.

12        THE WITNESS:  Thank you.

13        THE COURT:  And let me say this.  You indicated as

14   well that you have issues with members of your family.

15   They are not tarnished either.  Okay?  You only get one

16   family.

17        THE WITNESS:  Certainly strained.

18        THE COURT:  You know there are people out there in

19   the audience -- I know it is hard for you to face them --

20   but they are your family.  And they are not any more at

21   fault at this than you are.  Okay?

22        All right.  Thank you, ma'am.

23        Do you have any other questions?

24        MS ABER:  No, Your Honor.

25        THE COURT:  Do you have any questions?

R. Blohm - direct                    14

1        MR. BOWEN:  No, thank you.

2        THE COURT:  Thank you for coming that distance.  You

3    live in a very lovely town.  Austin is a nice place.  I

4    took a vacation there once.

5        Do you have anybody else?

6                (The witness stood aside)

7        MS ABER:  If I could have one moment, Your Honor.

8        THE COURT:  Take your time.

9        MS ABER:  The government calls Robert Blohm.

10       THE COURT:  All right.

11                     ROBERT BLOHM

12          WAS SWORN AND TESTIFIED AS FOLLOWS:

13                   DIRECT EXAMINATION

14   BY MS ABER:

15   Q    Sir, please introduce yourself to The Court.

16   A    My name is Robert Blohm.

17   Q    How do you spell the last name?

18   A    B-L-O-H-M.

19   Q    Are you related to Ms Blohm who just testified?

20   A    Yes.

21   Q    How so?

22   A    Husband.

23   Q    So that makes you the husband of Mr. Faulkner's

24   cousin; is that right?  Cousin-in-law?

25   A    Correct.

R. Blohm - direct                                    15

1    Q    Okay.

2         Did you also travel here from Texas today?

3    A    Correct.

4    Q    Tell The Court anything you would like to say before

5    he imposes a sentence.

6    A    I am not as prepared as my wife, but I did feel

7    compelled to come up here.

8         The impact to us isn't what it was to the grandmother

9    or mother of the other child by any stretch, but to

10   reiterate what my wife shared, it was, you know,

11   incredibly hard to go through this, to watch my wife deal

12   with this, to understand and take solace in the fact I

13   think we did dodge a larger bullet than what others have

14   been impacted by it.  But knowing that, you know, we

15   placed our trust in somebody, brought them in our home,

16   and gave them employment, you know.  Understanding that

17   this evil was there and that we weren't able to stop it,

18   you know, will leave an impression on us and our family.

19        And I think it is worth reiterating that, you know,

20   an individual who pre-meditatedly takes steps to take

21   advantage of family members, to think in advance about

22   grooming, and the idea that what could have happened had

23   these agents not stopped them when they did is, you know,

24   amazing.

25        I worked in the Federal Court in Arizona for a couple

R. Blohm - direct                                    16

1    years and worked in the file room.  And you have that

2    sealed room where the victims' names are.  And, you know,

3    it is always on the outside.  You don't think about it.

4    You know it is horrific, you know it is evil, but to have

5    it visit your house and in your home is something at

6    another level.

7        So, I don't know what the cure is for it.  I have no

8    conception of how to adjust to it or get people through

9    what they deal with, but I would offer that it has been

10   impactful to us, even though it has not been to the level

11   that, obviously, the other family has gone through.  So,

12   with that said, I just think that is maybe all I wanted to

13   offer.

14       THE COURT:  Tell me about -- both you and your wife

15   referred to giving employment.  I didn't quite understand

16   that.

17       THE WITNESS:  So when I first met Mr. Faulkner it was

18   up in Canada.  He was struggling to get work stuff going.

19   I gave him guidance on starting a company.  I offered an

20   opportunity to come down.  I was a partner in a consulting

21   firm.  I told him if he would like to come down I could

22   get him some work.  So he obviously has computer skills.

23   So we put him on staff under our director of IT.  And, you

24   know, he did work there, and he lived at our house.  And

25   then he made an effort to come back after we had kids.

R. Blohm - direct                                      17

1    You know.  What do you do?  Right?  You don't think

2    anything about it.  Then when the agents show up and show

3    you those pictures and the fact they are out there on the

4    web, you know, it is, like, you are kidding me.  You know.

5    And, like I said, the only thing that is a saving grace is

6    I think we did dodge a bigger bullet, you know.  But at

7    the same token, it was like it was one step away from

8    getting to where those other families were.

9           THE COURT:  All right.  Thank you, sir.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Any other questions?

12          MS ABER:  No, Your Honor.

13          THE COURT:  Do you have any questions?

14          MR. BOWEN:  No.

15          THE COURT:  Thank you, sir.  Thank you for coming.

16   Have a safe trip back.

17                   (Witness stood aside)

18          Do you have any other witnesses?

19          MS ABER:  No.

20          THE COURT:  Do you have any witnesses?

21          MR. BOWEN:  We do not, sir.

22          THE COURT:  All right.

23          Well, I will hear the government then on the motion

24   for a variance of the 3553(a) factors and the appropriate

25   sentence in this case.

1        MS ABER:  Yes, Your Honor.  Thank you.

2        I will not rehash what I previously argued to The

3    Court, because I think the arguments for Mr. Falte apply

4    equally to Mr. Faulkner, and also the sentencing position

5    we have filed in the sealed pleadings.

6        I would like to clarify one thing that I said.  I

7    said that Mrs. Blohm is a victim.  They certainly are

8    victims of Mr. Faulkner.

9        THE COURT:  I understand they are not victims in the

10   legal sense.

11       MS ABER:  They are relevant conduct victims, and I

12   think that goes to Mr. Faulkner's personal

13   characteristics.

14       THE COURT:  Goes to his culpability.

15       MS ABER:  Exactly.  And likelihood of recidivism.

16       I would urge The Court, though, to consider that the

17   matters in the sealed pleadings do provide a basis to

18   support Mr. Faulkner, the good he has done, so for that

19   reason a sentence short of life imprisonment gives him

20   credit for that, and that is why the government seeks

21   that.

22       THE COURT:  Okay.

23       MS ABER:  Thank you.

24       THE COURT:  Thank you very much.

25       All right.  Mr. Bowen.

1          MR. BOWEN:  What a fine place to be this morning.

2          THE COURT:  What is that?

3          MR. BOWEN:  What a fine place to be this morning.

4          While it is on my mind, and after Ms Aber mentioned

5     it, as soon as Mr. Faulkner was arrested he took whatever

6     steps he could to not just expiate his sins, if you will,

7     but to lend assistance, the kind of rule 35 assistance we

8     all look for to aid the government in prosecuting other

9     crimes.  He was in a peculiar situation, I think that the

10    government will agree, to share inside information about

11    how to go about stopping some of what he had done.

12         And met again with the government on a later date to

13    try to further that.  And has remained available to do

14    that.

15         That being said, it is a tough situation.  Nobody,

16    not Mr. Faulkner or anybody else, asked to be born with

17    this type of disease.  It is just not -- nobody asked to

18    be born this way.  And he is, of course, ever since he was

19    ten or nine, he knew something was wrong and that he

20    wasn't normal.

21         And because of -- in the certain way Ms Blohm touched

22    on, too, the ability to get this out in the open is

23    like -- to be able to confess your sins -- not in her

24    case -- but to at least share the agony with the public in

25    some way is a great benefit.  Mr. Faulkner and his parents

1   have been able to speak candidly, probably for the first

2   time ever, because of this, the deep sin, the moral

3   problem of it.  You know, he knew it.  He knew it was

4   wrong.  He took steps from time to time to do something

5   about it.  But like other addictions, he just wasn't

6   strong enough, willing enough, I don't know what, to get

7   it done, to stop.  And so here we are.

8        It is a schizophrenic life, if you will.  I think Ms

9   Aber commented on it, maybe you did, that, you know, you

10  see one picture of Mr. Faulkner.  It is like the boy next

11  door, you know, helpful to the neighbors, helpful to

12  people, law abiding.  And then we have this disease part

13  that nobody even knows about.  It is kind of -- there is a

14  movie called Crocodile Dundee -- it sounds kind of trite

15  in a way -- but a line there, somebody says, well, you

16  just tell Wally your problem and everybody will know about

17  it and you won't have to get a psychiatrist.  Nobody told

18  Mr. Faulkner that.  So, this is where we are.

19       There is nothing we can say to minimize the thrust of

20  the pain that these people feel.  Appropriately so.  There

21  is noting that we can do to minimize the breach of trust

22  to society.  This is an educated, bright, young man and

23  there is no excuse for that.

24       The Bureau of Prisons probably has, I can only

25  imagine that they have some hope for him.  But I don't

1    hold out great hope.  In fact, The Court earlier in

2    Mr. Falte's case was talking about deterrence.  It is a

3    Christian myth according to a lot of people.  It sounds

4    good, perhaps you are right that it works with white

5    collar crimes, but the people with addictive behavior it

6    is not enough until they cure the disease.  He has got to

7    fight that for the rest of his life, however long that is.

8         We don't chose to speculate about how long

9    Mr. Faulkner will live, what kind of treatment he might

10   get, where he will be landed once he's classified, but I

11   dare say that no matter what The Court does -- and let me

12   just say this, the reason why we took the position we did

13   about thirty years versus fifty years wasn't to say thirty

14   years was the right sentence or that forty years or fifty

15   years was, we took that as a way to differentiate what the

16   government was asking while at the same time appreciating

17   they were not asking for a life sentence.

18        And so, I don't know that any of us are smart enough

19   to know exactly what the right sentence is.  That is why

20   you get paid the big bucks to kind of try to delineate

21   that.  I may be the only person in the room right now who

22   actually argued for life before, you know, rather than the

23   death penalty, and here I am by contrast.

24        So the enormity of the situation, much as to the

25   victims, but to Mr. Faulkner and to his family, is such

1    that he won't, no matter what you do, Your Honor, what you

2    sentence him to today, won't sink in today.  The enormity

3    of that will kind of gradually sink in.  He will leave

4    here today for Nashville where he will be prosecuted for

5    similar offenses in Federal Court in Nashville.

6         THE COURT:  Is that case set for trial?

7         MR. BOWEN:  I don't believe it is.  We have a rule 5

8    hearing when we leave this morning, and then I guess he

9    will be sent to Tennessee pretty quickly.

10        But, the point is, Mr. Faulkner will be classified.

11   And he will be tested, you know.  And then he is going to

12   enter to a population he has never known before.  So the

13   enormity of the situation will continue.  Maybe several

14   years down the road Mr. Faulkner will be able to calm down

15   a little bit and say, hum, can I make plans for a future?

16   Whatever you give him, if you give fifty, if you give him

17   life, or thirty years, he is still going to have to have

18   to make plans for what he is going to do.  It is going to

19   be difficult.  Not looking for sympathy, nor is he asking

20   for it.

21        But being the optimist that I am, it is nice to think

22   maybe he can do good for other people.  He is a bright

23   young man, and I hope that, I hope that he continues to

24   realize that the bank account he has is sitting back

25   there.  He really doesn't have much, you know.  So I hope

1    that he continues to realize the value of his family.  And

2    that he makes plans for the future, whatever Your Honor

3    choses to do today.  And does something to make the best

4    of a terrible situation.

5         That is all I can ask you to do, sir.

6         THE COURT:  Thank you very much.

7         Any response to that?

8         MS ABER:  No, Your Honor.

9         THE COURT:  All right.

10        Mr. Faulkner, when you were hear before I said that

11   before I impose sentence you would have an opportunity to

12   stand up and tell me anything you want to.  Do you want to

13   speak to me?  Come up to podium and I will be happy hear

14   from you.  If you don't want to speak to me you don't have

15   to.

16        THE DEFENDANT:  I am all right.

17        THE COURT:  Thank you.

18        You may be seated.  Okay.

19        Well, let me go through the 3553(a) factors and the

20   appropriate sentence in this case.

21        The nature and circumstances of the offense is the

22   first thing I am to consider.  It is simply dreadful.

23   Mr. Faulkner was involved in a site or sites on the dark

24   web.  He was involved with sites that involved child porn

25   trading, chat rooms where they talked about sex with

1   children, and eventually arranged sexual liaisons with

2   potential kids.  He bragged on the internet how he had

3   been able to talk people out of pursuing him when he had

4   engaged in improper conduct.

5       Somewhere in that internet world he met Mr. Dix.  He

6   made several trips from Canada to the Richmond and

7   Manassas area.  He and Mr. Falte, and perhaps others, met

8   the child that was the victim of this case.  Groomed that

9   child by befriending her with gifts and ice cream and food

10  and so forth.  He touched her genitalia.  He performed

11  oral sex on her.  He masturbated and ejaculated on her,

12  and made videos.  He and Mr. Falte made videos of their

13  misconduct.  So, the nature and circumstance of the

14  offense are simply worse than the worst horror book you

15  can imagine.

16      Okay.  The history and characteristics of the

17  defendant.  To his credit Mr. Faulkner has essentially no

18  criminal history, or no criminal history.  He is from a

19  middle class background.  He has a good and loving family.

20  He has done a great deal to get himself educated.  He has

21  been helpful to members of his family.  Kind to them.  And

22  yet there is this evil side.  He touches and molests kids.

23  Uses his charm.  And I remember him talking to me the last

24  time he was here.  He is a charming fellow.  He uses that

25  charm to calm parents down when he gets caught.

1        He is not married.  He has no dependents.  No

2    children.

3        Physical condition is good.  He does not appear to be

4    a substance, abuser.  He has, as I understand it, the

5    Canadian equivalent of master's degree or high degree in

6    computer science.  He has been employed in that area

7    steadily.

8        His character, I would say that the bad

9    characteristics in him far out weigh the good ones.  That

10   is about as simple as I can make it.

11       All right.  The next factor that I am to consider is

12   the need for the sentence to reflect the seriousness of

13   the offense.  Well, the sentencing laws passed by Congress

14   reflect the seriousness of the offense.

15       The next factor I am to consider is the need to

16   promote respect for the law.  This fellow has no respect

17   for the law or anyone else.  No respect at all.  Traveling

18   all over the country to molest kids.  Going down to Texas

19   to hit on his cousin's kids.  Just sociopathic

20   egocentricity.  And the worst part of it is that he leaves

21   people -- I am sure he feels regret, I am sure he wishes

22   he didn't have this problem -- but he leaves other people

23   feeling trashed.  You know, God knows what will happen to

24   this little girl who was the victim of this.  God knows

25   what will happen to the Blohm's cousins in Texas.  God

1    knows what his parents think.  They are probably wondering

2    what did we do wrong?  Well, they didn't do anything

3    wrong.  None of those people did anything wrong.

4         All right.  The next factor is the need to provide

5    just punishment.  Any punishment would be just in this

6    case and would need to be heavy, as reflected by the

7    mandatory minimum in this case.

8         The need for the sentence to perform adequate

9    deterrence is the next thing.  Again, I doubt that this

10   will deter others, deter other sexual offenders.  But, I

11   am not sure what opportunity he will have to commit sexual

12   crimes in the future.

13        The next factor is the need to protect the public

14   from further crimes of the defendant given that he is a

15   one-man sex crime spree.  That is really important in this

16   case.  Very, very important.

17        All right.  The next factor is the need to give him

18   education, vocational training, and medical care and other

19   treatment.  I would hope he will be assigned to a

20   correctional facility that at some stage will have

21   treatment for pedophilia.  But that seems fairly relevant

22   to me.

23        All right.  The kinds of sentences available.

24   Maximum of life.  Mandatory minimum of thirty years.

25        I find that he is not capable of paying a fine, and

1    he is not capable of paying the -- are you retained,

2    Mr. Bowen?

3         MR. BOWEN:  I have been retained, yes.  Sir, yes.

4         THE COURT:  Okay.  All right.

5         Well, I don't think he is capable of paying the extra

6    fine that goes with -- the extra assessment that goes with

7    these kinds of cases.  He is not going to have a valid

8    earning capacity for a long time.

9         I am to take into account the guidelines, which are

10   life in this case; the need to avoid sentencing

11   disparities among similarly situated defendants.  Again,

12   anybody in this case would expect a long, long sentence,

13   which he will get today.

14        Next factor is the need to provide restitution.

15        In this case, as in the other one, you are not

16   seeking restitution?

17        MS ABER:  That's correct, Your Honor.

18        THE COURT:  Okay.

19        There will be no restitution here.

20        There are two motions for variance.  The government's

21   motion for variance of fifty years is based on his

22   cooperation, which is commendable.  I thank you for doing

23   that, Mr. Faulkner.

24        The other is on the fact that maybe he will be able

25   to do something good with his life if he is out a little

1    earlier.  Both are from the defendant, and both of those

2    is going to be denied.

3         All right, Mr. Faulkner, please stand up.

4         Pursuant to the factors set forth forth in 18 U.S.

5    code section 3553 and the Sentencing Reform Act of 1984,

6    and having considered the Federal Sentencing Guidelines as

7    advisory, it is the judgment of The Court that you are

8    hereby committed to the custody of the U.S. Bureau of

9    Prisons for a term of life.  This sentence is sufficient

10   but does not exceed the amount of time necessary to

11   achieve the goals of sentencing as set forth in 18 US code

12   section 3553.  It reflects the seriousness of the offense,

13   promotes respect for the law, provides just punishment for

14   the offense, affords adequate deterrence to criminal

15   conduct, and protects the public from further crimes that

16   you may commit.

17        I will recommend that Mr. Faulkner be assigned to a

18   correctional facility as near as possible to the border

19   with Ontario Province, Canada.  Does he live -- I am going

20   to reflect my lack of knowledge of Canadian geography

21   right now.  As I understand, Ontario sort of goes from

22   like up near Niagara Falls all the way over to Detroit.

23        MR. BOWEN:  Other than speculate, we could ask.  They

24   live in shag fly country, straight north from ours to the

25   border.

1          THE COURT:  Well, I will recommend that he be sent to

2     somewhere near to his -- assigned to a prison near the

3     border with Ontario.

4          If you are released from prison you will be put on

5     supervised release for a term of life.  You have to report

6     within 72 hours to the custody of the Bureau of Prisons.

7     You will not commit any crimes while you are on supervised

8     release.  Don't use controlled substances.  You can't have

9     a gun.  While on supervised release you will comply with

10    the standard conditions of supervised release as

11    recommended by the U.S. Sentencing Commission.  You will

12    participate in any programs recommended -- psychological

13    programs, mental health programs -- recommended by your

14    probation officer.  The cost of those programs are to be

15    paid by the government.  You won't be subjected to a

16    plethysmograph.  You waive any right to patient

17    confidentiality, records of mental health treatment.

18         I have considered your net worth, liquid assets, your

19    life style and financial needs, your earning potential and

20    dependents relying on your support.  You are not capable

21    of paying a fine, no fine will be imposed.  But you do

22    have to pay a special assessment in the amount of hundred

23    dollars which is due in full immediately if you have not

24    already paid it.

25         Okay.

1          Sir, you have 14 days to appeal this sentence to the

2    U.S. Court of Appeals for the Fourth Circuit.  If you want

3    to do that, file a notice of appeal with the clerk of this

4    court.  You don't have to pay a fee to do that.  If you

5    are unable to hire a lawyer, they will appoint a lawyer

6    for your appeal.  And if you can't get hold of Mr. Bowen

7    to do that for you, simply send a letter to the Clerk,

8    U.S. District Court, not the Court of Appeals, but here in

9    the District Court, and that will get it rolling for you.

10          I will say to you what I said to Mr. Falte a little

11    while ago, this undoubtedly looks awful to you, and it is

12    awful, what you are going to be subjected to.  You are, as

13    I would recall, a very, very bright and articulate person.

14    You will be in a population of people who are not so

15    gifted.  I hope that at some stage in your incarceration

16    you will be able to find a way to assist those people so

17    they can get on with their lives when they get out.  I

18    hope you will find a way to be a servant to others.

19          I have arranged for you to be able to speak with your

20    family here in the courtroom for a few moments before you

21    go.

22          The Marshals will allow that to happen.

23          You are remanded to custody U.S. Marshal.

24          God bless you, sir.  All right.

25          Adjourn court.

1                       HEARING ADJOURNED.

2

3          THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

4                  GILBERT FRANK HALASZ, RMR

5                   OFFICIAL COURT REPORTER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25